UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| REGINA L. BANKS, | ) | CIVIL ACTION |
| Plaintiff, | ) | |
| | ) | Case No. 1:14-cv-2825 |
| | ) | |
| v. | ) | Honorable Sharon Johnson Coleman |
| GREEN TREE SERVICING, LLC and BANK OF AMERICA, N.A., | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendants. | ) | |

**REGINA BANKS' JOINT RESPONSE IN OPPOSITION TO
DEFENDANTS' RULE 12(b)(6) MOTIONS TO DISMISS**

Plaintiff REGINA BANKS ("Banks") responds jointly in opposition to the Rule 12(b)(6) Motions to Dismiss filed by GREEN TREE SERVICING, LLC ("Green Tree") and BANK OF AMERICA, N.A. ("BANA") (collectively "Defendants") as follows:

### INTRODUCTION

To describe the last eighteen months of Ms. Banks' existence as "Sisyphean" would be one of the greatest understatements of all time. The illegitimate collection activities employed by BANA and Green Tree – to bully Ms. Banks from her family home – is the textbook result of unchecked power run amok. Despite fully complying with the terms of her mortgage loan for the last decade, Ms. Banks has been unwillingly situated in a perpetual state of "default." Her payments (in-full and on-time) have all been accepted while her written disputes categorically ignored. She was assessed thousands in illegal fees, subjected to threats of frivolous foreclosure, and, in short, intimidated by two faceless institutions with deep pockets and a fleet of high-priced representatives. BANA and Green Tree made the choice to "double-down" on their errors and omissions – rather than accommodate a customer of 12 years who simply sought a proper accounting of her mortgage loan. It now becomes necessary for this Honorable Court to ensure that Ms. Banks can escape the Sisyphean fate that was unwittingly cast upon her.

1

**FACTS SUPPORTING THE CAUSES OF ACTION**

In April 2002, Banks obtained a mortgage loan from Countrywide Home Loans, Inc. for $93,840.00. (Compl. ¶¶ 14-15; Ex. A.) The mortgage loan required monthly payments of $1,020.00. (*Id*. ¶ 15.) For the last 12 years, Banks has made all of the required payments on-time and in-full. (*Id*. ¶ 17.) In an effort to pay off the mortgage loan several years early, Banks made payments in excess of what was owed each month. (*Id*. ¶ 16.) Shortly after origination, the servicing rights to the mortgage loan were assigned to BANA. (*Id*. ¶ 10.)

On March 9, 2013, BANA sold the servicing rights to Green Tree with an effective date of April 1, 2013. (*Id*. ¶ 18.) At that time, the true loan balance was $32,440.81. (*Id.* ¶ 19.) However, upon the sale of servicing rights, BANA claimed that the loan was in default and provided Green Tree an inflated balance. (*Id.* ¶¶ 21-25.) On March 21, 2013, Green Tree incorrectly stated that Banks owed a balance of $33,091.21 in its initial communication; Green Tree claimed that Banks was in default and owed late fees and charges. (*Id.* ¶¶ 20-21, 26.) In response, Banks called and wrote BANA and Green Tree disputing the "default" and the incorrect principal balance. (*Id.* ¶ 23.) On April 18, 2013, Banks sent her first Qualified Written Request ("QWR") and dispute letter to both Defendants stating, "Green Tree has the wrong balance transfer amount." (*Id.* ¶¶ 24-25.)

Without verifying the subject debt or ceasing collection, Green Tree assessed more late fees against Banks for allegedly being in default, and called Banks' cell phone and work phone repeatedly seeking to collect the "past due" amount. (*Id.* ¶¶ 26-28.) This alleged "past due" amount was incorrect, and Green Tree continued to treat the debt as if it were in default. (*Id.* ¶ 84.) Neither BANA nor Green Tree ever provided a substantive response to Banks' first dispute letter. (*Id.* ¶¶ 29-35.) From the time that it acquired serving rights, Green Tree continued to send

Banks default letters and dunning letters, threaten acceleration and foreclosure, and assess hundreds of dollars in unearned fees and late charges. (*Id.* ¶¶ 33-35, 39-41, 43.)

On May 29, 2013, 41 days after receipt of Banks' first dispute letter, Green Tree replied by stating, "*As of the date of this correspondence, your principal balance is $31,817.00....*" (*Id.* ¶ 36.) Green Tree continued to treat the loan as if it were in default; the true balance at that time was $31,218.03. (*Id.* ¶ 37.) Even though Banks never missed a payment, Green Tree refused to correct the accounting or take her out of "default" status. (*Id.* ¶¶ 38-40.) On May 13, 2013 and May 15, 2013, Green Tree sent Banks a notice of default intent to accelerate. (*Id.* ¶¶ 34-35.)

On July 17, 2013, Banks sent Green Tree her second QWR and dispute letter ("second dispute letter"). The letter stated, among other things:

> I called your offices today and spoke with one of your representatives; she informed me that you've received only two payments from me since you acquired my mortgage in March of 2013. I [have] records from my bank accounts with Chase that you've received and cashed 3 checks for over $1,000.00 each....So if you were paid for April, May and June can someone tell me how I owe you for March?...If I owe less than $30,000.00 what makes your company believe that you'll get it in foreclosure if you play with the numbers. (*Id.* ¶ 42.)

On August 12 and August 13, 2013, Green Tree sent Banks two more notices of default to collect the "defaulted" debt. (*Id.* ¶ 43.) Threatened and feeling defeated and bullied into an imminent foreclosure, Banks paid all of the late fees and other amounts that Green Tree claimed she owed. (*Id.* ¶ 44.) Banks felt as though she had no choice but to submit. (*Id.*)

On October 19, 2013, Banks sent another QWR and dispute letter to both Green Tree and BANA ("third dispute letter"). (*Id.* ¶ 45.) The letter requested verification of the debt, including a copy of the payment history, complete loan transaction history, the full name, address, and telephone number of the current creditor (under § 1641(f)(2) of TILA). (*Id.* ¶ 45.) On November 2, 2013, BANA sent a response to Banks' third dispute letter that included only BANA's loan history without any response or explanation. (*Id.* ¶ 47.) Green Tree did not respond to Banks'

3

second or third dispute letters at all. (*Id.* ¶ 48.)  Banks has never received a payment history or other documentation regarding the debt from Green Tree. (*Id.* ¶ 49.)

Along the way, Green Tree called Banks' cell phone at least 15 times and work phone at least 15 times to collect upon the "defaulted" debt by using an automatic telephone dialing system ("ATDS"). (*Id.* ¶¶ 51-53.)  Banks repeatedly demanded that Green Tree cease the harassing phone calls, as she never consented to allow Greet Tree to contact her by cell phone. (*Id.* ¶¶ 54-55.) However, Green Tree continued to make the calls. (*Id.* ¶¶ 56-57.)

## STANDARD

To survive a motion to dismiss brought pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual material, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). In ruling on a pending motion to dismiss, the court must construe the allegations in the complaint in a light most favorable to the plaintiff, accept as true all well-pleaded factual allegations set forth therein, and draw all reasonable inferences in favor of the non-moving party. *Fednav Int'l Ltd. v. Continental Ins. Co.,* 624 F.3d 834, 837 (7th Cir. 2010). In the event the court finds that dismissal is warranted, the court should grant the plaintiff leave to amend unless amendment would be futile. *Ford v. Neese*, 119 F.3d 560, 563 (7th Cir. 1997).

## ARGUMENT

### I. BANA AND GREEN TREE'S FAILURE TO RESPOND OR INVESTIGATE BANKS' QWRS VIOLATES RESPA

BANA and Green Tree violated RESPA § 2605(e) when they failed to acknowledge receipt of Banks' dispute letters, conduct a reasonable investigation, correct the servicing errors within 60 days, or provide any substantive response. (Compl. ¶¶ 24-59.) *Baginski v. JPMorgan Chase Bank, N.A.*, 2012 WL 5989295, at *2, *5-6 (N.D.Ill. 2012) (RESPA 2605(e) violations for

4

failure to respond to borrower inquiries); *Johnson v. Bank of America, N.A.*, 173 F.Supp.2d 809, 813 (N.D.Ill. 2001). *See also* 12 U.S.C. § 2605(e)(2) (requiring servicers to respond in one of three ways to a QWR: (a) investigate a borrower's complaint and make corrections to the borrower's account, (b) explain why it believes that corrections are not warranted, or (c) provide an explanation why the information requested in unavailable).[1]

Green Tree did not respond to Banks' second and third dispute letters at all. (Compl. ¶ 48.) In response to Banks' first dispute letter, Green Tree failed to correct any of the servicing errors or conduct any investigation with respect to the improper charges. (*Id*. ¶¶ 24-25, 36.) Similarly, BANA's responses to the first and third dispute letters did not include any explanations or assistance in correcting the serving errors; BANA did not investigate Banks' servicing disputes. (¶¶ 30-31, 47.) *See Catalan v. GMAC Mortg., Corp,.* 629 F.3d at 687-88 (written servicing dispute qualifies as a QWR and triggers the servicer's obligations to respond).

Banks sent her first, second, and third dispute letters to Green Tree. (Compl. ¶¶ 24, 42, 45.) Banks also sent her first and third dispute letters to BANA. (*Id.* ¶¶ 42, 45.) Banks clearly alleged that BANA and Green Tree did not respond or failed to sufficiently respond to each QWR. (*Id.* ¶¶ 13, 29, 31, 36, 40, 47-48, 50, 69.) Instead, BANA and Green Tree continued to accept all of Banks' timely payments, claim that she was in default, inflate the principal balance, and assess improper late charges and fees against her account. (*Id*. ¶¶ 44, 61.) "A reasonable inference arising from these allegations is that because [the Defendants] failed to correct or investigate the misapplied payments, [Banks was charged] interest on a higher principal balance

---

[1] "A servicer may respond in one of three ways: (1) a servicer may 'make appropriate corrections in the account of the borrower, including crediting any late charges or penalties, and transmit to the borrower written notification of such correction'; (2) a servicer may provide the borrower with a 'written explanation or clarification that includes ... a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer'; or (3) a servicer can provide 'a written explanation or clarification that includes ... information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer.'" *Kesten v. Ocwen Loan Servicing, LLC,* 2012 WL 426933, at *6 (N.D.Ill. 2012).

than [she] should have," in violation of RESPA §§ 2605(e) and (f). *Marais v. Chase Home Finance, LLC,* 736 F.3d 711, 720-21 (6th Cir. 2013) (citing *Johnson*, 173 F.Supp.2d at 814).

In its motion, BANA argues that Banks failed to identify how BANA violated RESPA after it sold the servicing rights. (BANA Mtn. p. 3.) BANA does not cite to the relevant sections of RESPA or provide any case law to support its position; therefore, BANA's argument should be considered waived. *Fernandes v. JPMorgan Chase Bank, N.A.*, 818 F.Supp.2d 1086, 1094 (N.D.Ill. 2011) (declining to consider undeveloped argument in a motion).

If the Court considers BANA's position, Banks' clearly alleged that BANA failed to adequately respond to the first and third dispute letters, failed to conduct an investigation, and failed to provide a statement as to why BANA believed the account to be correct. (Compl. ¶¶ 30, 31, 47.) BANA merely responded with no written explanation and attached meaningless documentation. (*Id.*) At the core of Banks' allegations, BANA provided Green Tree with false information as to the true loan balance and falsely claimed that the loan was in default. (*Id.* ¶¶ 21-25.) BANA is not immune from RESPA's requirements simply because it sold the servicing rights. "RESPA is a consumer protection statute that regulates the real estate settlement process, including servicing of loans and *assignment of those loans.*" *Catalan*, 629 F.3d at 680 (emphasis added) (RESPA claims brought against *original and subsequent* mortgage servicers).

A servicer's obligation to respond to a QWR arises upon receipt of a request for "information relating to the servicing of such loan." 12 U.S.C. § 2605(e)(1)(A). If BANA's conduct prior to selling the servicing rights even partially led to the errors, it had an obligation to investigate and correct its own accounting upon receipt of Banks' QWR. It failed to do so.

Banks' entire complaint is founded upon the fact that BANA (and then Green Tree) never corrected the serving errors through the filing of the complaint – well outside of the 60 day

6

period defined by RESPA. *Vought v. Bank of America, N.A.*, 2010 WL 4683599, at *1-*2, 5-*6 (C.D.Ill. 2010) (denying motion to dismiss RESPA claim that payments were not properly credited during the 60-day transfer period). Instead, BANA provided Green Tree with incorrect servicing information when it sold servicing rights, held Banks in default, and then failed to make any corrections. (*Id.* ¶¶ 21-25, 30-31, 47.)

Green Tree's argument with regard to the RESPA claim is equally lacking in substance and law. Green Tree primarily argues that Banks' RESPA claim is insufficient as Banks did not separate her alleged violations into subsections, making the cause of action "highly confusing." (Gr.Tr. Mtn. pp. 11-12.) In reality, Banks' allegations are clear and concise with concrete allegations as to what specific provisions of RESPA were violated, satisfying federal notice pleadings requirements. *Twombly,* 550 U.S. at 570. Similar to *Jones v. U.S. Bank, N.A.*, 2011 WL 882758, at *6 (N.D.Ill. 2011), Banks sufficiently alleged that she sent three dispute letters seeking information regarding the alleged "default," the accounting of her payments, and the calculation of her principal balance; Green Tree never responded to the second and third dispute letters. *Id.* at *6 (denying motion to dismiss) (citing *Vician v. Wells Fargo Home Morg.,* 2006 WL 694740, at *4 (N.D.Ind. 2006) ("Plaintiffs allege that they made a written demand on Wells Fargo to which they have not received a response. Taken in the light most favorable to Plaintiffs, these allegations are sufficient to state a claim for a violation of section 2605 of RESPA.")).

Green Tree cites to no case law, then concludes that no violations of RESPA sections 2605 and 2609 occurred. Green Tree does not even suggest that it responded to Banks' QWRs within the timeline in § 2605(e). *See Catalan*, 629 F.3d at 680 (RESPA requires servicers to "respond promptly to borrowers' written requests for information.").

7

It is sufficient for Banks to allege that both BANA and Green Tree failed to make appropriate corrections to her account or investigate her disputes in response to her QWRs. *Baginski*, 2012 WL 5989295, at *2, *5-*6 (RESPA violations for failure to respond to QWR). At a minimum, a factual dispute exists as to whether corrections were ever made to Banks' account. *Id. Johnson,*173 F.Supp.2d at 814. *See, e.g., Mazzei v. The Money Store*, 349 F.Supp.2d 651, 662 (S.D.N.Y. 2004).

## II. BANKS PROPERLY STATED A VIOLATION OF TILA AGAINST GREEN TREE

### A. Section 1641(f)

TILA requires servicers to respond to inquiries regarding the identity of the master servicer and owner of the subject loan. 15 U.S.C § 1641(f). Green Tree argues that it is not liable under TILA because it did not obtain *ownership* of the subject loan from BANA. (Gr.Tr. Mtn. p. 4.) TILA § 1641(f) states, "[u]pon written request by the obligor, the *servicer* shall provide the obligor, to the best knowledge of the servicer, with the name, address, and telephone number of the owner of the obligation or the master servicer of the obligation." *Id.* (emphasis added). While it is true that TILA creates liability for the owners of debt obligations and not servicers, a servicer is liable if it is also a creditor or a creditor's assignee, and a creditor may be held vicariously liable for the actions of their servicer agents. *Marais*, 736 F.3d at 716.

Here, on October 19, 2013, Banks sent a written request to Green Tree pursuant to TILA § 1641(f). (Compl. ¶111.) Green Tree failed to respond to Banks' § 1641(f) request with any information that identified the name, address, and telephone number of the "owner" or "master servicer" of the debt in violation of TILA. (*Id.* ¶¶ 45, 50, 111.) Inadequate disclosure of this information, such as not providing the name and address, gives rise to liability. *St. Breux v. U.S. Bank, N.A.*, 919 F.Supp.2d 1371, 1378-80 (S.D.Fl. 2013). "[A] violation of § 1641(f)(2) occurs,

as some courts have sensibly concluded, either (i) after a 'reasonable time' has passed since the obligor sent a request without the servicer having sent any response, or (ii) when the servicer sends an inadequate response to that request." *Bradford v. HSBC Mortg. Corp.,* 829 F.Supp.2d 340, 352 (E.D.Va. 2011). *Stephenson v. Chase Home Fin., LLC,* 2011 WL 2006117, at *2-*3 (S.D.Cal. May 23, 2011) (denying a motion to dismiss a TILA 1641(f) claim against the servicer for failing to identify the master servicer or owner of the loan in response to a 1641(f) request).

Here, Green Tree is improperly withholding the required information about the true creditor. (Compl. ¶111.) However, it should be noted that Green Tree has identified "Green Tree Servicing LLC" as the true "creditor" in separate correspondences dated May 13, 2013 and August 13, 2013.[2] If Green Tree is the true creditor, then it is liable under TILA. *Marais*, 736 F.3d at 716. If another party is the creditor, that party would be liable for Green Tree's inaction as its servicer. *Id.* Further discovery is required to make this determination, and as a result, the motion to dismiss should be denied at this stage of litigation. (Compl. ¶ 111.)

### B. Section 1666d

Banks alleged that she requested a refund of a credit balance over $1.00, but Green Tree failed to refund her credit balance in violation of TILA § 1666d. (Compl. ¶¶ 114-115.) *Whittaker v. Wells Fargo Bank, N.A.*, 2013 WL 5442270, at *4 (M.D.Fla. 2013) (denying motion to dismiss §1666d alleging a failure to refund a credit balance). Once again, until the true owner of the debt is identified, Green Tree's motion is premature and should be denied at this stage of litigation.

### III. BANKS PROPERLY STATED AN FDCPA CLAIM AGAINST GREEN TREE

Green Tree is a debt collector and subject to the FDCPA because it treated the loan as if it were in default at the time it acquired servicing rights. (Compl. ¶ 11, 84.) A party cannot be both

---

[2] This allegation is not specifically alleged in the complaint. Banks would request leave to amend her complaint to include this allegation.

a creditor and a debt collector, as the two categories are mutually exclusive. *Clark v. Pinnacle Credit Services, LLC*, 697 F.Supp.2d 995, 999 (N.D.Ill. 2010). The first inquiry is "'whether the debt was in default at the time it was acquired'" by the defendant. *Id.* (quoting *Ruth v. Triumph Partnerships*, 577 F.3d 790, 796 (7th Cir. 2009)). If the debt is in default at the time of the transfer, the FDCPA treats assignees of the debt as "debt collectors." *Id.* The Seventh Circuit has gone on to clarify that if a party *treats* a loan as in default at the time the debt is acquired, *even if the loan was not actually in default*, that party is still a "debt collector" for purposes of the FDCPA. *Schlosser v. Fairbanks Capital Corp.*, 323 F.3d 534, 536 (7th Cir. 2003).

### A. At all times, Green Tree Treaded the Loan as a Debt in Default

When Green Tree purchased servicing rights in March 2013, it treated the debt as if it were in default. (*Id.* ¶¶ 11, 84.) Upon selling the servicing rights, BANA claimed that the loan was in default and provided Green Tree an inflated loan balance. (*Id.* ¶¶ 21-25.) From that point, Green Tree continued to send Banks default letters and dunning letters threatening acceleration and foreclosure, while assessing hundreds of dollars in unearned fees and late charges. (*Id.* ¶¶ 33-35, 39-41, 42.) During this time period, Green Tree assessed more late fees for the "default," and called Banks' cell phone and work phone seeking to collect the "past due" amount. (*Id.* ¶¶ 26-28, 51.) Green Tree acquired the debt based on the understanding that the debt was in default, and its collection attempts were also based on that understanding. *Schlosser,* 323 F.3d at 536.

Green Tree always treated the loan as "a debt in default" and never took Banks out of default status at any time. *Ruth,* 577 F.3d at 796; *McKinney v. Cadleway Properties, Inc.*, 548 F.3d 496, 502 (7th Cir. 2008) ("[U]nder *Schlosser*'s interpretation of the 'mutually exclusive' statutory definitions of 'creditor' and 'debt collector,' [the servicer] is a debt collector."). As such, Green Tree is a "debt collector."

10

In its motion, Green Tree cites to *Hutchins v. Fairbanks Cap. Corp.*, 2003 WL 1719997 (N.D.Ill. 2003) and argues – contrary to its own conduct for 16 months – that it is not a debt collector because the loan is not default. (Gr.Tr. Mtn. p. 7.) Green Tree's argument is misplaced.

In *Hutchins*, the court held that the defendant was not a "debt collector" because the loan was not in default at the time it acquired the debt *and* because the defendant never claimed nor believed the loan to be in default. *Id.* at *2-*4. The promissory note in *Hutchins* was unique, where it specifically defined "default" to mean an event *after* the borrower missed a payment *and* the creditor sent a specific written notice to the borrower. *Id.* at *3. In other words, merely missing a payment did not amount to the note's definition of default; an additional step in the form of a written notice had to be taken by the creditor. *Id.* Since the defendant (or its predecessor) had not taken that additional step at the time of the transfer, it did not treat or believe the loan to be in default. *Id.* at *2. Therefore, the defendant in *Hutchins* was not a "debt collector." *Id.* The Court noted, "[t]he language of the FDCPA...is clear, and from this court's reading of *Schlosser*, it stands for nothing more than if the debt collector believes that the loan is in default, they cannot claim otherwise." *Id.* at *5, n.1 (citing *Schlosser*, 323 F.3d at 538-39).

Here, Green Tree – at all times – believed and treated the debt to be in default. On the same date it acquired servicing rights, it claimed a default amount of "$2,040.46" and later sent an acceleration notice that claimed a default "as of April 1, 2014." (Compl. ¶ 11, 21-28, 39-41, 84.) Moreover, from the onset of its duties as servicer, Green Tree called Banks approximately 30 times and sent numerous dunning letters claiming a payment default (*Id.*) Green Tree *treated* the subject loan as if it were in default with an understanding that it acquired a debt in default. (*Id.*) *Schlosser*, 323 F.3d at 536.

11

Moreover, Banks' promissory note (which is not included as part of the complaint) defines a default as, "If I do not pay the full amount of each monthly on the date it is due, I will be in default." This definition of default is opposite to that of the note in *Hutchins*. Here, there is no requirement that the lender send a written notice to trigger an event of default; instead, any missed payment alone is an event of default based on the express language of the note. Since Green Tree had a mistaken belief that the debt was in default when it acquired the debt, it is a "debt collector." *Hutchins*, 2003 WL 1719997, at *4-*5 ("As the [*Schlosser*] court stated, the provision exempting from the FDCPA a debt collector attempting to collect a debt not in default did "not apply because [the assignee] attempted to collect on a debt that it asserted to be in default and because the asserted default existed when [the assignee] acquired the debt.")

## IV. BANKS STATES A VALID TCPA CLAIM AGAINST GREEN TREE

"To state a cause of action under the TCPA a plaintiff must allege that: (1) a call was made; (2) the caller used an ATDS *or* artificial *or* prerecorded voice; (3) the telephone number called was assigned to a cellular telephone service; and (4) the caller did not have prior express consent of the recipient." *Thrasher–Lyon v. Ill. Farmers Ins. Co.,* 861 F.Supp.2d 898, 905 (N.D.Ill. 2012) (Castillo) (emphasis added). Banks alleged that 15 calls were made (a) to her cell phone, (b) using ATDS, (c) that Banks did not consent to the calls and demanded that they stop, (d) that she was charged for the calls, and (e) Green Tree continued to call despite her protests. (Compl. ¶¶ 26-28, 51-57, 116-18.)

Green Tree focuses on the fact that Banks' complaint does not allege *why* she believed the phone calls were made using ATDS – presumably that she did not plead that there was a pause when she picked up the phone or pre-recorded voice.[3] In support, Green Tree cites to

---

[3] If necessary, Banks would request to amend her complaint to include allegations that all of the phone calls began with what sounded like computerized "beeps" and a 5 second delay prior to a human connecting on the other end.

*Johansen v. Vivint, Inc.*, 2012 WL 6590551, at *1 (N.D.Ill. 2012), where the court determined that the complaint should have described the calls in laymen's terms and why plaintiff believed them to be made using ATDS. However, the allegations in *Johansen,* are inapposite to those in Banks' complaint. In *Johansen*, the plaintiff filed a class-action lawsuit that alleged that only two phone calls were made using ATDS; theses allegations were bare-bones and in only one paragraph of the complaint. *Id.* at *2. It should be noted the *Johansen* court specifically stated, "[a]ny one call made using an ATDS or any one pre-recorded message violates TCPA if made to a cellular phone. [] The fact that Plaintiff specifically alleges at least two occasions on which a violation may have occurred is enough at this stage." *Id.*

Here, Banks' TCPA allegations span 12 paragraphs, and she pleads specifics regarding the phone calls. (Compl. ¶¶ 26-28, 51-57, 116-18.) Banks does more than repeat the elements of a TCPA claim; she identified the number of calls, the time, and the place that she received the calls – through her car's speaker system – and how the calls disrupted her time with clients. (*Id.* ¶ 57.) "Defendants fail to account for Plaintiffs' non-conclusory factual allegations that satisfy the stricter standard." *Sojka v. DirectBuy, Inc.*, 2014 WL 1304234, at *6 (N.D.Ill. 2014). *See, e.g., Hanley v. Green Tree Servicing, LLC*, 934 F.Supp.2d 977, 983–84 (dismissed TCPA complaint where the plaintiff failed to "plead how many calls [the defendant] allegedly made to him in violation of the [TCPA]" or "when the allegedly offending calls were made"). *See also Aronson v. Generation Mortgage Co.,* 2014 WL 641622, at * 1 (W.D.Pa. 2014) (plaintiff pled a viable TCPA claim where he "provided sufficient details of the date, time and place ... of the offending call in support of his claim."). *Evans v. Corinthian Colleges, Inc.*, 2014 WL 2866369, at *2 (S.D.Ind. 2014) ("Requiring Plaintiff to plead with more...would impose an unnecessary burden on the plaintiff, essentially requiring TCPA claims to be pled with the same heightened

level of particularity as fraud cases. That asks too much of a plaintiff who files a TCPA complaint....Defendant can seek through discovery the additional specifics.").

It stands to reason than none of the information as to how Green Tree stores its numbers should within Banks' knowledge or control. "[I]t would be virtually impossible, absent discovery, for any plaintiff to gather evidence regarding the type of machine used for a communication left on a plaintiff's voicemail." *Torres v. Nat'l Enter. Sys., Inc.*, 2012 WL 3245520, at *3 (N.D.Ill. 2012). *Lozano v. Twentieth Century Fox Film Corp.,* 702 F.Supp.2d 999, 1010 (N.D.Ill. 2010). Lastly, a Green Tree Rule 30(b)(6) witness in *Castro v. Green Tree Servicing, LLC,* 959 F. Supp.2d 698 (S.D.N.Y. 2013) unequivocally testified that Green Tree employs automatic telephone dialing systems.

### V. BANKS PROPERLY STATED AN ICFA CLAIM AGAINST ALL DEFENDANTS

ICFA is a "regulatory and remedial statute intended to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive practices." *Boyd v. Sasco Aames Mortg. Loan Trust*, 787 F.Supp.2d 747, 752 (N.D.Ill. 2011).

Defendants argue that Banks' ICFA claim is a breach of contract claim in disguise. (Gr.Tr. Mtn. pp. 9-10.) In reality, Banks' allegations of unfairness and deception "implicate consumer protection concerns," amounting to "more than a mere breach of contract claim." *Llames v. JPMorgan Chase & Co.*, 2012 WL 1032910, at *3 (N.D.Ill. 2012). *Typpi*, 2014 WL 296035, at *8 (finding that plaintiff stated an unfairness claim beyond breach of contract on similar facts). Banks' ICFA allegations more than mirror her breach of contract claim. *Id.*

#### A. Unfairness

A plaintiff is entitled to recover under ICFA *for any* unfair or misleading conduct. *Windy City,* 536 F.3d 663, 670 (7th Cir. 2008). A practice is unfair if it (1) violates public policy; (2) is

14

so oppressive that the consumer has little choice but to submit; and (3) substantially injures consumers. *Bywater v. Wells Fargo Bank, N.A.*, 2014 WL 1256103, at *3 (citing *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010)). The second element is met if a practice is "'immoral, unethical, oppressive, or unscrupulous.'" *Id.* (quoting *Windy City*, 536 F.3d at 672). An allegation of specific unfair conduct and resulting harm is enough to plead unfairness. *Id.* There is no heightened pleading standard to state ICFA unfairness. *Id.* at *2.

It was unfair to (a) refuse to respond to Banks' inquiries, (b) provide conflicting communications, (c) place Banks in a perpetual state of "default," (d) refuse to conduct an investigation, (e) assess illegal charges and fees, and (f) threaten foreclosure of Banks' family home. (Compl. *generally*.) "Courts that have interpreted the meaning of 'unfair practice' have held that a plaintiff states a claim under ICFA where the defendant's conduct gave plaintiff no reasonable alternative to avoid a charge or penalty." *Typpi*, 2014 WL 296035, at *8. Here, Banks had no alternative to avoid the late fees and penalties as she was bullied into believing her home would be taken in a foreclosure lawsuit. (*Id*. ¶34-35, 39, 43-44, 99.) While any of BANA and Green Tree's actions in isolation may not be oppressive enough to violate public policy, when taken as a whole over an 18 month period, Defendants' conduct was so unethical and unending, that Banks had no choice but to submit. *Typpi*, *supra*. (*Id.* ¶¶ 44, 99.)

    B. <u>Deception</u>

A claim for deception involves (1) a deceptive act; (2) intent that the consumer rely on the deception; and (3) that the deception took place during a course of conduct involving trade or commerce. *Robinson*, 201 Ill. 2d at 417. Reasonable reliance is not an element of ICFA deception. *Cozzi Iron & Metal, Inc. v. U.S. Office Equipment, Inc.*, 250 F.3d 570, 576 (7th Cir. 2001). The first and second prong may be satisfied by innocent representations; plaintiff need

15

only show that the defendant intended plaintiff to rely (intentionally or unintentionally) on the deceptive information. *Choi v. Aegis Mortg. Corp.*, 286 F.Supp.2d 956, 963-64 (N.D.Ill. 2003).

Defendants sent Banks misleading statements, including default, acceleration, and foreclosure notices that she relied upon to her detriment – she was tricked and bullied into making the payments for fees that she did not owe. (Compl. ¶34-35, 39, 43-44, 99.) Defendants further misrepresented the effect of Banks' payments and whether or not she could even avoid a foreclosure by continuing to make all of the payments as required by her loan. (*Id.*) Banks alleged the specific dates and information surrounding the payment history, the late charges, the QWRs, default notices, dunning letters, foreclosure threats, the phone calls and correspondences between the parties. (*Id.*.) The allegations provide the who, what, where, and when of the entire deceptive process, from start to finish. *Michalowski v. Flagstar Bank, FSB*, 2002 WL 113905, at *5-6 (N.D.Ill. 2002) (finding ICFA deception claim sufficiently pled).

### VI. BANKS PROPERLY STATED A CLAIM FOR BREACH OF CONTRACT

To state a claim for breach of contract, the plaintiff must allege (a) the existence of a contract with the defendant (Compl. ¶ 60.); (b) plaintiff's performance under the contract (*Id*. ¶¶ 61-62.); (c) defendants' breach of the contract (*Id*. ¶¶ 61-62.); and (d) the plaintiff's resulting damages. (*Id*. ¶¶ 62-67.) *Demes v. ABN Amro Services Co., Inc.*, 2001 WL 563813, at *1 (N.D.Ill. 2001) (citing *Petri v. Gatlin*, 997 F.Supp. 956, 963-64 (N.D.Ill. 1997)).

Green Tree does not dispute that Banks properly pled a breach of contract claim, but instead, argues that her claim is barred by the "voluntary payment doctrine." (Gr.Tr. Mtn. p. 10.)

This novel argument does not apply to Banks' fact-pattern. Preliminary, and as a practical matter, if the voluntary payment doctrine did apply, a consumer who is current on her mortgage loan could never sue for breach of contract. Taking that one step further, a consumer who is

intimidated with threats of foreclosure may reasonably chose to protect her family's home prior to running to the courthouse. This doctrine does not force citizens to choose between a file stamp-date on their complaint and the protection and sanctity of their family home.

Under the general rule, "[a]bsent fraud, coercion or mistake of fact, monies paid under a claim of right to payment but under a mistake of law are not recoverable." *Smith v. Prime Cable of Chicago*, 276 Ill. App. 3d 843, 847-48 (1st Dist. 1995). Here, Banks is claiming a breach of contract based upon the misapplication of payments, improper late fees, inflation of the principal balance, conversion of escrow funds to unauthorized fees and costs, violation of the implied duty of good faith, and improper threats of default and foreclosure. (Compl. ¶¶ 60-67.)

In its motion, Green Tree relied upon *Randazzo v. Harris Bank Palatin*, 262 F.3d 663, 664-66 (7th Cir. 2001). In *Randazzo*, the defendant-lender threatened to sell the plaintiff-borrower's AOL stock if the borrower did not voluntary sell the stock himself to pay off the loan. *Id.* After paying off the loan, the borrower learned that the contract did not even allow for the bank to sell the stock. *Id.* The borrower sued for breach of contract, and the bank countered with the voluntary payment doctrine. *Id.* The Seventh Circuit agreed that the doctrine applied because (a) the plaintiff admitted that he never read the contract prior to filing the lawsuit, (b) did not protest the sale of the stock, and (c) was not under duress for items of necessity. *Id.* at 671.

Here, even if the voluntary payment doctrine did apply, Banks' breach of contract claim is not founded solely on the wrongful assessment – and subsequent payment – of the illegal fees. It is also founded upon the misapplication of payments, inflation of the principal balance, conversion of escrow funds, violation of the implied duty of good faith, and improper threats of foreclosure. (Compl. ¶¶ 60-67.) Even if the doctrine did apply to a portion of Banks' breach of contract claim, it does not address the remaining breaches.

17

Additionally, coercion or duress is a defense to voluntary payment. *Randazzo*, 262 F.3d at 666-67. Banks has alleged that she paid the undue fees to avoid the threats of foreclosure (*Id.* ¶ 44.) If the asset is a necessity and the consequences of nonpayment would adversely affect the asset, duress is a motivating factor to payment. *Arra v. First State Bank & Trust Co. of Franklin Park*, 250 Ill. App. 3d 403, 408 (1st Dist. 1993) (enough evidence of duress to overturn grant of summary judgment in case involving the plaintiffs' home, "which was certainly a necessity."). *Kanter & Eisenberg v. Madison Assocs.*, 116 Ill. 2d 506, 515 (1987) (payment of disputed rent made under duress where nonpayment would result in the termination of a valuable leasehold.)

Moreover, Illinois recognizes dispute and protest as particularly good evidence of duress. *Smith*, 276 Ill. App. 3d at 848-49; *Arra,* 50 Ill. App. 3d at 408. To determine whether duress motivated the payment of a demanded sum, attention must be given to the nature of the asset involved and the consequences of nonpayment. *Getto v. City of Chicago*, 86 Ill. 2d 39, 55 (1981).

First, Banks made repeated protests in the from of three dispute letters. (*Id.* ¶ 24, 42. 45.) Second, a home is not only a necessity, but one of the most basic and fundamental needs for any family – and foreclosure is a grave consequence. Banks has made clear allegations that she paid the illegal fees and charges out of fear of losing her home. (*Id.* ¶ 44.) At an absolute minimum, a reasonable inference can be made that any consumer faced with repeated threats of default and foreclosure would only pay illegal fees out of necessity and while under duress.

        Respectfully Submitted,

        By: ___/s/Ross M. Zambon___
           Attorney for Plaintiff

Ross M. Zambon
ARDC # 6294149
Mara A. Baltabols
ARDC # 6299033
900 Jorie Blvd., Suite 150
Oak Brook, IL 60523